IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

RENARDO L. CARTER,

                Plaintiff,                          OPINION & ORDER

   v.                                                      12-cv-655-wmc

LIZZIE TEGELS, TIM THOMAS
and KAREN SPARLING,

                Defendant.
---

KWESI B. AMONOO,

                Plaintiff,                          OPINION & ORDER

   v.                                                      12-cv-693-wmc

LIZZIE TEGELS, TIM THOMAS
and KAREN SPARLING,

                Defendants.
---

In these civil actions, *pro se* plaintiffs Renardo L. Carter and Kwesi B. Amonoo claim that prison officials at New Lisbon Correctional Institution violated their constitutional rights by preventing them from freely exercising their Muslim religion. Specifically, plaintiffs allege that defendants denied them their right to congregate services in April 2012. Defendants have moved for summary judgment in both cases. Because the defendants' claims, relevant facts, arguments and applicable legal principles are the same in the two cases captioned above, the court will take up their merits together for the purposes of summary judgment. The court will also grant defendants' motions in full in both cases because: (1) defendants are entitled to qualified immunity with respect to plaintiffs' claim under the Free Exercise Clause; and (2) plaintiffs have failed to come forward with sufficient evidence for a reasonable jury to find that defendants either favored certain religions

without a legitimate secular reason or arbitrarily treated plaintiffs differently because of their religion.

## UNDISPUTED FACTS

### I. The Parties

During the time relevant to this case, plaintiffs Renardo Carter and Kwesi Amonoo were incarcerated at the New Lisbon Correctional Institution ("NLCI"), where all defendants were then employed by the Wisconsin Department of Corrections ("DOC").[1] Lizzie Tegels was the warden; Tim Thomas was the deputy warden; Karen Sparling was (and remains) the chaplain.

As chaplain, Sparling is generally responsible for administering NLCI's ministerial programs to meet the spiritual needs of inmates. She arranges for religious worship services, instruction, classes, special activities and individual counseling. Sparling has various resources available to enhance her knowledge about different religions, including DOC's Religious Practices Advisory Committee ("RPAC") and other DOC chaplains.

### II. Overview of DOC Religious Policies

DOC Division of Adult Institutions ("DAI") Policy #309.61.01 establishes "umbrella religion groups." If a prisoner wishes to congregate with other prisoners for religious purposes or possess religious property, he must choose one of the umbrella groups, which include Protestant, Islam, Native American, Catholic, Jewish, Eastern Religions and Pagan. Both Carter and Amonoo designated Islam as their religious preference.

---

[1] Carter was released from DOC custody on October 28, 2014. Amonoo remains incarcerated at NLCI.

### III. Means of Religious Observance Generally Available to Islamic Inmates

Islamic inmates at NLCI may personally exercise their religious beliefs and practices in a variety of ways, including: (1) requesting a religious diet; (2) observing Ramadan; (3) engaging in personal religious study; (3) accessing the collection of Islamic books and publications in NLCI's chapel library; (4) requesting pastoral visits from an Imam; (5) performing prayers in their living quarters; and (6) requesting to abstain from work or a program on days of religious observance.

As for group activities, NLCI holds Jumu'ah and Taleem services for Islamic inmates when possible. Jumu'ah is an Islamic congregational prayer traditionally held on Fridays and led by a volunteer Imam. Taleem is a religious group study period generally held on a weekly basis. In 2012, Sparling also began a video program for all religious groups on a rotating basis. This program allows each group to watch videos on topics involving their religion once a week for four weeks.

### IV. Security Concerns Related to Congregate Religious Services

DAI Policy #309.61.01 requires that religious services be led by an approved volunteer, a DOC chaplain or an approved outside spiritual leader. Since 2001, the policy has specifically provided that "[u]nder no circumstances will *inmates* be authorized to lead or conduct a Religious Service or Study Group." (Emphasis added.) Furthermore, the policy mandates that a religious service for a particular umbrella religion group be led "by a qualified person of *that particular Umbrella Group Religion*." (Emphasis in original.) For example, as a Protestant chaplain, Sparling cannot lead non-Christian services under the policy.

3

According to defendants, allowing inmate-led religious services present an unacceptable security risk. In particular, defendants state that prison security is threatened when individual inmates can differentiate themselves as apparent leaders of a group, because they may then exert influence over others and create a power differential. Such power differentials among inmates can create the potential for assault, illegal enterprising, prostitution, drug dealing, gang activity or other unlawful activity. Defendants state that differing opinions on religious inspiration and teachings can also be a source of conflict by themselves.

Additionally, in the defendants' view, inmate-led services would disrupt the power dynamics in a prison setting and blur the necessary distinction between staff and inmates. Defendants are also concerned that it would foster a group leadership structure alternative to lawful authorities. Because certain groups have been disruptive within supervised chapel programs, even when outside volunteers have been present leading the services, a risk defendants maintain only increases in unsupervised activities.[2]

Although plaintiffs do not dispute defendants' security concerns, they do dispute whether the policy against inmate-led services is always strictly enforced.[3] Specifically, they aver that Sparling "hand-picked" an inmate, Gerald Wynter, to "lead" a service and prayer during the Eid feast at the conclusion of Ramadan in 2014, although Sparling point out in a

---

[2] Carter contends that no group has ever been disruptive (Pl.'s Resp. DPFOF (dkt. #36) ¶ 55, 12-cv-655), but he offers no evidentiary support for that statement, and he would not have the requisite personal knowledge to offer such sweeping testimony himself.

[3] Plaintiffs also state that atheists are allowed to speak while their volunteer merely supervises, such that they are leading "in essence." (Pl.'s Resp. DPFOF ¶ 60, dkt. #36 in 12-cv-655; dkt. #35 in 12-cv-693.) They provided no evidentiary support for this proposition, however, nor is it clear how plaintiffs, as longtime members of the Islamic umbrella religion group, would have the personal knowledge to testify to the proceedings at atheist meetings.

reply that she was also present and the inmate was only allowed to read a pre-written message and say a single prayer.[4]

## V. Difficulty Finding Volunteers to Lead Jumu'ah

Several DOC institutions have had difficulty identifying and maintaining Islamic volunteers to come to institutions on a weekly basis, as many Islamic leaders have their own mosques for which they are responsible for providing leadership. NLCI in particular had had difficulty securing volunteers because it is far removed from any urban areas where there might be a sufficient concentration of Islamic leaders to recruit volunteers.[5]

Sparling has worked diligently throughout her chaplaincy at NLCI to find a volunteer to lead Jumu'ah and Taleem studies for NLCI's Islamic inmates, including reaching out to Madison and Milwaukee-area congregations, to volunteers from other institutions and to RPAC contacts. In her efforts to secure an Islamic volunteer, she also spoke repeatedly with other DOC chaplains and pastors, as well as the DAI Religious Practices Coordinator in Madison. Additionally, she contacted mosques in Stevens Point and La Crosse, and she posted flyers at hospitals in La Crosse and Mauston. These efforts have proven largely unsuccessful. In particular, many of the Islamic volunteers Sparling

---

[4] In a supplemental declaration, Sparling acknowledges that during the Eid al-Fitr in 2014, she permitted an inmate to read verbatim a message that Bath Fall, the regular volunteer, had prepared for his own congregation and to say the Eid prayer. Regardless, Sparling did not consider this to be "leading" a service because she was present to supervise, and the inmate was permitted only to read a pre-written message and say a single prayer. (*See* Sparling Supp. Decl. ¶ 64, dkt. #49 in 12-cv-655; dkt. #47 in 12-cv-693.) To the extent there is a factual dispute regarding Wynter's role at a single event, it is immaterial.

[5] Carter asserts that at least some DOC institutions have successfully hired Islamic chaplains, and that NLCI never offered any Imam a job at the institution, although he provides no evidentiary support for these assertions. (*See* Pl.'s Resp. DPFOF ¶¶ 34-35, dkt. #36 in 12-cv-655.) In any event, these facts, even if true, do not raise a dispute as to whether it is difficult to secure Islamic volunteers at NLCI.

contacted were unable to commit to visiting NLCI on a regular basis due to time, work and travel constraints.

On occasion, NLCI *has* successfully located Islamic volunteers to lead services. When Sparling first began her work as the NLCI chaplain, the institution had a UW-Madison student volunteer, Fikrullah Kisa, who came to NLCI four or five times during 2011. Unfortunately, he moved to Turkey in November of 2011, and although he suggested a replacement, that person never returned Sparling's calls.

In April of 2012, NLCI was unable to secure a volunteer to lead Jumu'ah on a weekly basis. As a result, Muslims were not offered a group worship service during that month. Muslim inmates *were* offered other means to practice Islam during that month, although those means did not include congregate worship and, according to plaintiffs Carter and Amonoo, could not result in blessings comparable to those obtained through Jumu'ah.

Sparling next located a replacement volunteer on June 1, 2012, when Idis Hadiz began leading Islamic services at NLCI. He led only a few times before informing Sparling that he had become ill, and he never volunteered at NLCI again. Sparling then took up the search for yet another volunteer.

On December 7, 2012, Sparling located current NLCI volunteer Bath Fall, who initially volunteered every Wednesday for two hours of Taleem studies and the first Friday of each month for a two-hour Jumu'ah service. While the Taleem schedule has fluctuated, Bath Fall has continued to lead Jumu'ah one Friday per month, traveling two to three hours to reach NLCI from Milwaukee. If Bath Fall is unable to come to NLCI, Sparling provides religious videos as an alternative, and inmates are able to perform noon prayer, Dhuhr, in their cells.

## VI.  Services Offered to Other Religious Groups

According to Sparling, the religious makeup of the surrounding area is predominantly Catholic and Protestant, making it easier to find Catholic and Protestant volunteers than to find volunteers to lead weekly services for Islamic inmates.[6]  Specifically, NLCI has two Catholic priests, one from Mauston and one from New Lisbon, who switch off leading services, with a New Lisbon deacon available to fill in as needed.  There are also many Protestant congregations near NLCI, and volunteers include a Baptist minister from New Lisbon, a Lutheran minister from New Lisbon and several non-denominational ministers from Mauston who volunteer.  Even with all of these available volunteers, Protestant inmates missed their weekly service at least once in 2014 because no leader was able to come in.

In contrast, there is no mosque in New Lisbon, Mauston or any of the other smaller towns near NLCI.  Members of the Islamic umbrella group are not, however, the only ones to go without weekly services when NLCI cannot locate a volunteer to lead.  In 2012, Native Americans went for several weeks without sweat lodge because the volunteer frequently called and canceled.  Jewish inmates also went without services for several weeks in 2012, because the regular volunteer was unavailable.  When NLCI lost its regular rabbi, Sparling began searching for a new rabbi in a manner similar to her search for a regular volunteer Imam.  Eventually, she located two rabbis, one who volunteers once per month and one who volunteers as available.  Because Sparling cannot find a regular weekly volunteer, Jewish inmates frequently are not offered weekly services.

---

[6] Carter purports to dispute this fact, contending that "geography has no impact on job availability" (Pl.'s Resp. DPFOF ¶ 76, dkt. #36 in 12-cv-655), but he neither explains this statement nor cites to any admissible evidence in support.

OPINION

I. **Free Exercise Claim**

The Free Exercise Clause "prohibits the state from imposing a 'substantial burden' on a 'central religious belief or practice.'" *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (quoting *Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989)). "In the prison context, a regulation that impinges on an inmate's constitutional rights, such as one imposing a 'substantial burden' on free exercise, may be justified if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987)); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987). In assessing the regulation's relationship to legitimate penological interests, the court examines: (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact, if any, accommodation of the right will have on guards and other inmates and on the allocation of prison resources generally; and (4) whether there are ready alternatives to the regulation. *Turner*, 482 U.S. at 89-90.

As an initial matter, plaintiffs contend specifically that defendants' failure to hold Jumu'ah services in April of 2012 violated the Free Exercise Clause, but neither plaintiff disputes that Sparling engaged in an extensive, diligent search to locate a regular volunteer willing to lead Jumu'ah services. Nor do they dispute that Sparling was unable to do so during April of 2012 despite her efforts. They do not suggest that it is possible to offer Jumu'ah with *no* leader at all, although the court would likely have credited DOC's articulated security concerns with allowing a gathering of a group of inmates with no one in charge of the religious service. Finally, plaintiffs are adamant that *only* congregate services

8

would suffice to fulfill this tenet of their faith and that *none* of the substitutes that NLCI offered, including individual prayer and religious videos, were adequate.

This leaves two broader potential constitutional challenges to: (1) DAI Policy #309.61.01, which prohibits inmate-led services; and (2) defendants' failure to hire a Muslim chaplain or Imam. To survive summary judgment, plaintiffs must show that they had a clearly established First Amendment right either to inmate-led religious services or, in the alternative, to have NLCI hire someone to lead Jumu'ah.

To be fair, *Amonoo's* complaint does not refer to DAI Policy #309.61.01's requirement that services be led by an approved volunteer, and he rebuffs the notion that he wants inmates to lead services (Pl.'s Br. Opp'n at 5, dkt. #34 in 12-cv-693). But the undisputed facts show that the reason for the denial of Jumu'ah services in April 2012 was the prohibition on inmate-led services. If that is not what Amonoo is seeking, the court is at a loss as to what else defendants could have done, particular where he concedes that Sparling attempted to, but failed, to locate a volunteer to lead Jumu'ah services.

Thus, although Amonoo tries initially to frame his complaint as one for the simple denial of congregate religious services in April of 2012, he is really contending, like Carter, that NLCI should have offered Jumu'ah services in the absence of an outside volunteer -- meaning that an inmate would have to lead or DOC would have to hire an Imam to do so. Even framing plaintiffs' claims this generous way, they still fail at summary judgment for the reasons set forth below.

### A. Inmate-Led Services

The Seventh Circuit has previously held that prisons "need not . . . allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners." *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988). More recently, the Seventh Circuit directly addressed the same policy at issue in this case in *Turner v. Hamblin*, 590 F. App'x 616 (2014) ("*Turner I*"). In that case, the plaintiff, Turner, alleged that prison staff "impeded his free exercise of religion by canceling Islamic services," including Jumu'ah and Taleem, "when non-prisoners were unavailable to lead the services." *Id.* at 617-18. This court granted summary judgment for the defendants on grounds of qualified immunity, holding that no clearly established law requires prison staff "to hold religious services for inmates if no qualified nonprisoners are available to lead the service." *Turner v. Hamblin*, 995 F. Supp. 2d 859, 860 (W.D. Wis. 2014) ("*Turner II*").

The Seventh Circuit affirmed the finding of qualified immunity. It reasoned that even presuming that attending weekly Jumu'ah was a fundamental tenet of Islam, Seventh Circuit case law, such as *Johnson-Bey* and *Hadi v. Horn*, 830 F.2d 779, 784-85 (7th Cir. 1987), confirmed that prisons can constitutionally preclude inmates from leading services for security reasons. That precedent alone "doom[ed] Turner's case." *Turner I*, 590 F. App'x at 620. The Seventh Circuit further found that no clearly established law required the prison to hire a Muslim chaplain, to the contrary, "prisons need not provide chaplains 'without regard to the extent of the demand.'" *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). Nor did Turner point to any case law clearly establishing that the ban on inmate-led worship violated his free exercise rights.

10

Here, defendants have similarly asserted qualified immunity, which shields them from liability for monetary damages "when their actions do not violate clearly established constitutional or statutory rights."[7] 590 F. App'x at 619; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted) (alteration in original). Courts are required to define the clearly established right at issue on the basis of the specific context of the case. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). However, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* They must likewise be sure to draw all inferences in favor of the non-movant. *Id.*

Viewing the facts in the light most favorable to plaintiffs and resolving all disputes in their favor as the law requires, plaintiffs were denied Jumu'ah services -- indeed, all congregate religious services -- during the month of April 2012. This deprivation arose because, despite a diligent search, Sparling was unable to locate a volunteer who could lead Jumu'ah services on a regular basis, and prison policy barred Sparling from doing so as a Protestant chaplain.[8] Moreover, as discussed, prison policy also bans other inmates from leading religious services.

---

[7] Plaintiffs have requested *only* monetary relief -- specifically, punitive damages -- in this case, which means that qualified immunity disposes of the entire action if applicable.

[8] In his brief, Carter contends that Sparling once ran a Catholic service in the absence of a Catholic volunteer. (Pl.'s Br. Opp'n at 4, dkt. #34 in 12-cv-655.) Carter does not cite to any evidence in support of this statement, however, and so it cannot serve to create a genuine dispute of fact. Amonoo makes the same contention, and avers in his accompanying affidavit that Sparling's clerk told him that Sparling once ran a Catholic service in the absence of a Catholic volunteer. (Amonoo Aff. ¶ 1, dkt. #42 in 12-cv-693) This statement is hearsay and cannot serve to create a genuine dispute of fact as to whether Sparling has ever led Catholic services. *MMG Fin. Corp. v. Midwest*

11

Under these facts, *Turner I* strongly supports the conclusion that defendants are entitled to qualified immunity. If anything, this conclusion is made more compelling by another recent decision reviewing yet another challenge to the same DAI policy. In *West v. Grams*, No. 14-3623, 607 Fed. App'x 561 (7th Cir. Apr. 22, 2015) (collecting cases), the Seventh Circuit re-affirmed that "[i]t has *never* been clearly established that inmates have a right to inmate-led group worship under the First Amendment." *Id*. at 565.

The cases that plaintiffs cite do not alter this conclusion. In *Jackson v. Commissioner of Correction*, 661 N.E.2d 955 (Mass. App. Ct. 1996), as here, the plaintiff's theory was that Jumu'ah had to be led by an Imam -- and that provision for only non-Imam-led services violated his constitutional rights -- in many ways the opposite of plaintiffs' claim in this case. In *Perez v. Frank*, No. 06-C-248-C, 2007 WL 1101285 (W.D. Wis. Apr. 11, 2007), the plaintiff successfully challenged the denial of Jumu'ah services, but the success was based not on the merits of his claim but on defendants' failure to file proposed findings of fact, leaving them "without a single fact to support their alleged justifications." Id. at *13. Judge Crabb noted:

> I emphasize once again that the holding of this case is confined to its unique facts and posture. Should a similar case arise in the future, defendants would be free to submit factual evidence in support of their now-unsubstantiated claims that compelling reasons underlie the policies plaintiff has challenged successfully in this case.

*Id.* at *14.

---

*Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment."). Even if it were true, the fact that Sparling would have felt comfortable performing a Catholic ceremony on an emergency basis, does not mean she must undertake services that are wholly foreign to her, nor does it mean DOC generally, or defendants in particular, were compelled to order him to do so, especially since his presuming to do so may cause as much or more discord and impingement on rights as cancelling the service.

12

Finally, in *Jackson v. Verdini*, No. 03-4431, 2005 WL 1457748 (Mass. Super. June 9, 2005), the court denied a motion to dismiss premised on (1) failure to exhaust administrative remedies; (2) lack of physical injury; and (3) the alleged unconstitutionality of RLUIPA, but did not address the underlying merits of the denial-of-Jumu'ah claim. At best, these authorities are barely relevant and cannot overcome defendants' qualified immunity.

Plaintiffs also argue that since Sparling apparently selected an inmate to lead a service in 2014, her claimed reliance on internal policy and security justifications is undermined. In response, defendants point out that "[t]he failure to enforce a rule consistently does not make the rule unconstitutional." *Azeez v. Fairman*, 795 F.2d 1296, 1299 (7th Cir. 1986). Further, defendants point to the Seventh Circuit's *West* decision that found a defendant entitled to qualified immunity on a comparable free exercise claim despite *admitting* "that in the past the volunteer policy had not been enforced and that Muslim inmates were allowed to lead religious services on a rotating basis." 2015 WL 1813673, at *5.

For both these reasons, the court is inclined to agree that an inmate leading a service on one occasion, two years after the denial complained of in this case, does not undermine the defendants' entitlement to qualified immunity here.[9]

---

[9] Although the Seventh Circuit affirmed this court's holding with respect to the First Amendment in *West*, it vacated and remanded for further proceedings on the inmate's claim under the less demanding Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. 2015 WL 1813673, at *6. Here, neither Carter nor Amonoo ever pled a RLUIPA claim. This was no mere oversight, but rather a conscious choice as their complaints sought *only* monetary relief in the form of punitive damages. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (injunctive relief is the sole form of relief available under RLUIPA). Indeed, this court pointed out that plaintiffs could not proceed under RLUIPA at screening (dkt. #13 at 7 in 12-cv-655; dkt. #13

B. **Hiring Imam**

Plaintiff Carter also argues that NLCI should have hired a Muslim chaplain to lead Jumu'ah services regularly. This contention, too, is without merit. "Prisons need not provide every religious sect or group within a prison with identical facilities or personnel and need not employ chaplains representing every faith among the inmate population." *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011). "A plaintiff doesn't state a cause of action under the First Amendment merely because a prison allocates a disproportionately smaller amount of its religious budget to certain sects or provides clergy for one religion and not another." *Id.* at 718-19. Of course, differences in the resources available to religious sects *can* support a claim under the Free Exercise Clause. For instance, in *Maddox*, the inmate pled a viable claim that defendants "singled out" African Hebrew Israelite services for cancellation, disproportionately allocated the budget to other religions, and failed to pursue alternatives for AHI inmates to practice their faith. Carter has not, however, produced evidence of that sort in this case.

To the contrary, Carter acknowledges that Sparling diligently sought a volunteer to lead congregate services and provided a number of alternate means of practicing Islam in the meantime (albeit not in a group setting). On this record, even assuming NLCI could find one, given its location, the failure to hire an Imam cannot be said to violate Carter's clearly

---

at 7-8, in 12-cv-693) and also noted that because plaintiffs had stated a viable claim under the more demanding standards of the Free Exercise Clause, they could amend their complaints if they wished to request *injunctive* relief under RLUIPA as well. They chose not do so. Of course, any request by Carter for injunctive relief would now be moot as well, since Carter was released from DOC custody as of October 28, 2014 and is no longer "laboring under the allegedly unconstitutional policy or practice" he challenges. *Cf. West*, 2015 WL 1813673, at *4 (RLUIPA claim was *not* moot where inmate was still in custody and allegedly unconstitutional policy applied across entire Department of Corrections).

established First Amendment rights.  *See also Turner I*, 590 F. App'x at 620 (no clearly established law required prison to hire a Muslim chaplain).

In light of the above, the defendants are entitled to qualified immunity on plaintiffs' claims under the Free Exercise Clause of the First Amendment.[10]

## II. Establishment Clause and Equal Protection Clause

The court also granted plaintiffs leave to proceed on a claim that defendants violated the Establishment Clause and the Equal Protection Clause by permitting other religious groups "to fully practice their congregate tenets," including Catholic Mass, Sweat Lodge ceremonies and Protestant worship.  The Establishment Clause "prohibits the government from favoring one religion over another without a legitimate secular reason."  *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005).  The Equal Protection Clause prohibits state actors from purposefully treating an individual differently because of his membership in a particular class.  *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).  Under both theories, however, a legitimate secular reason for any difference in treatment is fatal to Carter's claims.  *Kaufman*, 419 F.3d at 683; *Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988) (difference in treatment must only be non-arbitrary).

Except superficially, plaintiffs present very little evidence that defendants treated other religions differently than Islam.  Indeed, they concede that: (1) a lack of volunteers caused Native Americans to miss sweat lodge for several weeks in 2012; and (2) Jewish inmates frequently are not offered weekly services due to difficulties locating a regular

---

[10] Given this ruling, the court need not address defendants' other asserted bases for summary judgment, including:  their contentions that the denial of Jumu'ah did not substantially burden plaintiffs' religious exercise; that the policy in question is rationally related to institutional security under *Turner v. Safley*; and that plaintiffs have made no showing of evil motive or reckless indifference, as would be required for an award of punitive damages.

weekly volunteer. They also concede that even Protestants have missed weekly services at least once due to the inability to locate a volunteer.

These concessions undermine plaintiffs' Establishment Clause/Equal Protection Clause claims. While the record certainly indicates that members of Christian umbrella groups were able to practice the congregate tenets of their religions more frequently than Muslim inmates, it is undisputed that the difference is attributable to DAI Policy #309.61.01 -- a neutral policy prohibiting inmate-led worship that the DOC applies with equal force to *all* religions. As the Seventh Circuit explained in *Turner I*, this prohibition's goal "of preventing inmates from gaining influence over other inmates is legitimate." 590 F. App'x at 620 (rejecting Establishment Clause challenge to policy banning inmate-led worship).

The plaintiffs' Equal Protection claim fails for essentially the same reasons. While the policy apparently does have a greater impact on some religions than others due to the location of NLCI and the dearth of Muslim volunteers nearby, disparate impact alone cannot propel plaintiffs past summary judgment. *See Adams v. City of Indianapolis*, 742 F.3d 720, 726 n.3 (7th Cir. 2014) ("[T]he Supreme Court's equal-protection jurisprudence does not recognize a claim for disparate impact."); *David K. v. Lane*, 839 F.2d 1265, 1271 (7th Cir. 1988) ("even though certain [Illinois Department of Corrections] regulations and policies, though facially neutral, may [affect] certain groups unevenly, such an uneven effect will not give rise to constitutional concern unless the policy is an obvious pretext for discrimination against the suspect class").

Here, plaintiffs fail to point to any evidence of discriminatory intent underlying DAI Policy #309.61.01's ban on inmate worship, and that fact is fatal to their equal protection

16

claim. Similarly, defendants needed only to show that the difference in treatment was non-arbitrary, and they have done so by linking differences in the need for security with the understandable difficulty locating volunteers for certain religions.

Finally, plaintiffs argue that Sparling offered "extra" Christian groups called Malachi Dads, Raising Godly Seed and Discipleship Leadership, allegedly for the purpose of "advancing Christianity." As a preliminary matter, plaintiffs did not allege a claim predicated on general favoritism toward Christianity, nor were they granted leave to proceed on such a claim. A plaintiff may not amend his complaint through arguments in a brief opposing summary judgment. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)).

Even assuming that plaintiffs *had* adequately pled this claim, they have not presented enough evidence for it to proceed past summary judgment. Within prisons, religions need not be treated identically without regard to the extent of the demand. *See Cruz*, 405 U.S. at 322 n.2; *Young v. Lane*, 922 F.2d 370, 377 (7th Cir. 1991); *Henderson v. Berge*, 362 F. Supp. 2d 1030, 1033 (W.D. Wis. 2005). Plaintiffs contend that the three stated Christian groups are "extra," but without supporting evidence, this amounts to nothing more than a conclusory statement, not a legitimate, material factual dispute.

Accordingly, plaintiffs have presented insufficient evidence to sustain either their Establishment Clause or Equal Protection claims on summary judgment. Defendants are, therefore, entitled to summary judgment on those claims as well.

ORDER

IT IS ORDERED that defendants' motions for summary judgment (dkt. #24 in 12-cv-655-wmc; dkt. #25 in 12-cv-693-wmc) are GRANTED. The clerk of court is directed to enter judgment for defendants and close these cases.

Entered this 15th day of March, 2016.

                                BY THE COURT:

                                /s/

                                _____
                                WILLIAM M. CONLEY
                                District Judge